# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JAMES PATRICK DONOGHUE,      :
                      :
         Plaintiff,       :
                      :
   v.                  :       Civil Action No. 23-cv-00157 (TSC)
                      :
NATIONAL ARCHIVES AND     :
RECORDS ADMINISTRATION, *et al.*,  :
                      :
         Defendants.     :

## <u>MEMORANDUM OPINION</u>

This case, brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, *id.* § 552a, *see* Complaint ("Compl."), ECF No. 1, at 9, is before the court on Cross-Motions for Summary Judgment.  *See* Defendants' Motion for Summary Judgment ("MSJ"), ECF No. 25; Plaintiff's Cross-Motion for Summary Judgment ("X-MSJ"), ECF No. 31. For the reasons explained below, Defendants' Motion is GRANTED, and Plaintiff's Cross-Motion is DENIED.

## BACKGROUND

At issue in this case are several FOIA and Privacy Act requests submitted by Plaintiff James Patrick Donoghue, proceeding *pro se*, to Defendants the National Archives and Records Administration ("NARA") and the Central Intelligence Agency ("CIA"), *see* Compl. at 9–20, 25–31, addressed below *seriatim*.

<u>NARA Requests</u>

1. <u>RD-52285, FOIA-LP-JC-2917-006, and NGC17-067A</u>

On February 10, 2017, Donoghue submitted a request to NARA's headquarters, located in College Park, Maryland ("Archives II") seeking records from 1976 through 1985, regarding an incident involving a MARSEA supply vessel, on which Donoghue, at age 17, was a merchant

seaman.  *See* Declaration of Joseph A. Scanlon Support MSJ ("Scanlon Decl."), ECF No. 25-3, ¶ 5; Scanlon Exhibit A (Pl.'s Ltr., Feb. 10, 2017) ("Request No. RD-52285"); Compl. ¶ 9.  The vessel was returning from Jamaica to Louisiana but ventured into Cuban territorial waters, resulting in American military intervention by the Carter Administration.  *See id.*  NARA assigned the request "No. RD-52285," and thereafter, "NARA Textual Services staff searched the NARA Catalog[,]" but determined that Archives II did not possess the records sought because, if available, the logbooks would be "kept at the NARA Regional Archives facility closest to the port of entry of a particular ship[.]" Scanlon Decl. ¶ 6; *id.* n.1.; Scanlon Exhibit B (NARA Response Ltr., Feb. 2017) ("Feb. 2017 NARA Ltr.").  In February 2017, *see* Scanlon Dec. ¶ 6; *id.* n.1, NARA responded to Donoghue, informing him of same, and referring him to the Carter Presidential Library and Museum and the United States Coast Guard National Vessel Documentation Center, *id.* ¶ 6; *see* Feb. 2017 NARA Ltr.

On March 14, 2017, Donoghue sent a supplemental letter to NARA, replicating Request No. RD-52285, and adding a request for any related records disclosed to the State of Alabama between 2006 and 2009.  Scanlon Decl. ¶ 7; *see* Scanlon Exhibit C (Pl.'s Letter, Mar. 14, 2017). On March 22, 2017, NARA responded, combining his supplemental letter with  Request No. RD-52285, and informing Donoghue that NARA maintains only federal, not state records. Scanlon Decl. ¶ 8; Scanlon Exhibit D (NARA Response Ltr., Mar. 22, 2017) ("March 2017 NARA Ltr."); *see* 5 U.S.C. § 552(f).  Nonetheless, NARA conducted an ultimately fruitless search.  *See id*.

Also in March 2017, Donoghue sent a request to the Carter Presidential Library and Museum ("LPJC"), again seeking substantially similar material regarding American military intervention of the MARSEA supply vessel and seeking any documents associating him with the

incident.  Scanlon Decl. ¶ 9; *see* Scanlon Exhibit E (Pl.'s Letter, March 2017) ("Request No.

FOIA-LP-JC-2917-006").  LPJC determined that the requested records would constitute

historical donated material, therefore exempting it from FOIA, but it nonetheless searched its

"finding aids of [its] donated historical material," finding no responsive records.  Scanlon Decl.

¶¶ 10–11; Scanlon Exhibit F (LPJC Response Ltr., Mar. 21, 2017) ("March 2017 LPJC Ltr.")

(citing 5 U.S.C. § 552(f)).  On March 21, 2017, LPJC responded to Donoghue, apprising him of

this outcome, noting that other NARA components could possess material relevant to Request

No. FOIA-LP-JC-2917-006, and enclosing general educational materials regarding the National

Archives Catalogue, MARSEA, and the U.S. Coast Guard.  Scanlon Decl. ¶¶ 10–11; *see* March

2017 LPJC Ltr.

    On June 14, 2017, Donoghue appealed LPJC's response to Request No. FOIA-LP-JC-

2917-006.  Scanlon Decl. ¶ 12; *see* Scanlon Exhibit G (Pl.'s Appeal Ltr., June 14, 2017)

("Appeal No. NGC17-067A").  In his appeal letter, Donoghue explained that he sought records

regarding the MARSEA incident so that he could investigate whether they were potentially

related to his subsequent state conviction.  *See id.*  More specifically, Donoghue contended that,

in 2008, while awaiting trial for criminal charges brought against him in Baldwin County,

Alabama, two unnamed "federal agents" allegedly unlawfully presented a "composite file" to the

prosecutor, his attorney, and certain court personnel, which contained sensitive information

about Donoghue from "several different federal agencies," thus negatively influencing his

Baldwin County case, resulting in his conviction and life sentences.  *See* Appeal No. NGC17-

067A; *see also* Pl.'s Opposition ("Pl.'s Opp'n"), ECF No. 27, at 6–8, 11; Compl. ¶¶ 9, 11, 18.

He postulated that this composite file might have contained unfairly prejudicial information

about him resulting from an investigation undertaken by the U.S. Coast Guard, the FBI, and potentially others, into the MARSEA incident.  *See* Appeal No. NGC17-067A.

In response to Appeal No. NGC17-067A, NARA performed additional searches for records at NARA, the National Archives at Fort Worth, and LPJC.  Scanlon Decl. ¶ 13. Specifically, "[s]taff at each facility searched the National Archives Catalog, the National Security Council Institutional Files, the Remote Archives Capture Project, and other finding aids of records held at the library using the Plaintiff's name and other numerous search terms such as MARSEA; vessels; boats; seaman/seamen; intervene; intervention; Coast Guard; international waters; and Universal Iron Works."  *Id.*   No responsive records were found.  *Id.* ¶¶ 13–14; *see* Scanlon Exhibit H (NARA Determination Ltr., June 10, 2019) ("June 2019 NARA Ltr.").  On June 10, 2019, NARA notified Donoghue of same and closed Appeal No. NGC17-067A. Scanlon Dec. ¶ 14; June 2019 NARA Ltr.

2.  NGC20-086

On November 12, 2019, Donoghue sent a request to NARA, seeking the composite file and any records that revealed which, if any, federal agencies or Congressional committees made requests, between April and August 2008, for documents about him.  Scanlon Dec. ¶ 15; *see* Scanlon Exhibit I (Pl.'s Letter, Nov. 12, 2019) ("Request No. NGC20-086.").  In response, NARA  determined that it held no responsive records, because "the records sought had a retention period of two years, and thus any records from 2008 would have already been destroyed in accordance with NARA's Records Control Schedule."  Scanlon Dec. ¶ 16; Scanlon Exhibit J (NARA Response Ltr., Dec. 10, 2019) ("Dec. 2019 NARA Ltr.").  On December 10, 2019, NARA sent a letter to Donoghue informing him of same and closing Request No. NGC20-

086.  It also advised Donoghue that he could "contact the agencies and Congressional

Committees directly to ask for any records in their custody."  *See id*.

> 3.  <u>NGC22-539/NGCPA22-002 and NGC22-072A</u>

On April 25, 2022, Donoghue sent NARA another request, seeking records regarding

himself, and asked that it use number "100-HQ-42778 serial 12" in its search.  *See* Scanlon Decl.

¶ 17; Scanlon Exhibit K (Pl.'s Letter, Apr. 25, 2022) ("Request No. NGC22-539/NGCPA22-

002"); Compl. at 18–19, 25–27.  He also asked that NARA search specific record systems,

namely, "NARA 3"—Donors of Historical Material Files; "NARA 7"—FOIA Request Files, and

Mandatory Review of Classified Documents Request Files; "NARA 8"—Restricted and

Classified Records Access Authorization files; "NARA 23"—Office of Inspector General

Investigative Case Files; and "NARA 35"—Case Management and Reporting Systems.  *See id*.

Upon receipt of the request, NARA assigned it No. NGC22-539/NGCPA22-002, and

then performed searches of NARA 3, 7, 8, and 35, using Donoghue's name, and searching for

"100-HQ-42778 serial 12," only finding responsive records in NARA 7, namely 44 pages

consisting of Donoghue's FOIA and Privacy Act requests and their associated agency responses.

Scanlon Decl. ¶ 18.

Meanwhile, NARA's Office of Inspector General ("OIG") was tasked with searching

NARA 23, also using Donoghue's name and the provided serial number, but it found no

responsive records.  *See* Scanlon Decl. ¶ 19; Scanlon Exhibit L (OIG Response Ltr., May 24,

2022) ("May 2022 OIG Ltr.").  On May 24, 2022, OIG notified Donoghue of this outcome, and

advised him to reach out directly to the agency, if any, that issued the serial number.  *See* May

2022 OIG Ltr.  It also informed him that NARA would notify him separately regarding the

outcome of its searches of NARA 3, 7, 8, and 35.  *See id*.

Before that happened, however, on August 19, 2022, Donoghue filed an appeal, challenging, *inter alia,* OIG's response and NARA's lack of response.  *See* Scanlon Decl. ¶ 20; Scanlon Exhibit M (Pl.'s Letter, Aug. 19, 2022) ("Appeal No. NGC22-072A").  On August 11, 2023, NARA responded to Donoghue.  Scanlon Decl. ¶ 23; *see* Scanlon Exhibit N (NARA Appeal Determination Ltr., Aug. 11, 2023) ("Aug. 2023 NARA Ltr.").  It advised that NARA searched the requested record systems, locating 44 pages of responsive records from NARA 7, and 53 pages of responsive records from NARA 35, comprising Donoghue's Official Military Personnel File.  All 97 pages were produced in full.  *See id.*  NARA also explained that it was unsurprising that neither NARA 3 nor NARA 8 contained any responsive records, as those systems only store records for individuals who have donated historical records, or for NARA employees and federal contractors.  *See* Aug. 2023 NARA Ltr.  It then closed Appeal No. NGC22-072A.  *See id.*; Scanlon Decl. ¶ 23.

CIA Request

1. No. P-2016-00874

On July 14, 2016, Donoghue submitted a request to the CIA for any documents related to investigations concerning himself, by the CIA or otherwise.  Declaration of Mary C. Williams Support MSJ ("Williams Decl."), ECF No. 25-5, ¶ 5; Williams Exhibit A (Pl.'s Letter, July 14, 2016) ("Request No. P-2016-00874").  He also noted that potential responsive records might relate to his late grandfather, George Lanno Donoghue, and his former associates.  *See* Request No. P-2016-00874.

On August 9, 2016, the CIA confirmed receipt of Request No. P-2016-00874, and advised Donoghue that, because he sought personally identifiable information, his Request fell under the Privacy Act, thus requiring a Certification of Identity form.  Williams Decl. ¶ 6 (citing

32 C.F.R. § 1901.13); Williams Exhibit B (CIA Response Ltr., Aug. 9, 2016) ("Aug. 2016 CIA

Ltr.").  The CIA also indicated that, insofar as Donoghue sought information about his late

grandfather, it required additional information to process that portion of the Request.  *See id*.

On September 9, 2016, Donoghue returned an executed copy of the Certification of Identity and

withdrew any inquiry relating to his grandfather.  Williams Decl. ¶ 7; *see* Williams Exhibit C

(Pl.'s Ltr., Sept. 9, 2016).

Thereafter, the CIA conducted searches "limited to records that would reveal an

unclassified or openly acknowledged association with the CIA."  Williams Decl. ¶¶ 12, 30.  It

searched for in five different records systems:

> (1) electronic versions of all Agency records that have been reviewed
> and/or compiled for potential public release; (2) a system containing
> information regarding personnel affiliated with the CIA; (3) a system
> containing information regarding the Agency's previously-released
> records, concerning various topics and individuals; (4) a system
> containing security records; and (5) an electronic inventory of archived
> Agency records.

*Id*. ¶ 13.  The CIA searched using variations of Donoghue's name, his social security number,

and date and place of birth.  *Id*.

On October 5, 2016, the CIA issued a final response to Donoghue, notifying him that its

searches did not result in any responsive records in which the association with the CIA was

unclassified or openly acknowledged.  *Id*. ¶ 8; Williams Exhibit D (CIA Response Ltr., Oct. 5,

2016) ("Oct. 2016 CIA Ltr."); Compl. at 13.  To the extent that Request No. P-2016-00874 "may

have implicated records whose association with the Agency was classified or otherwise

unacknowledged, the Agency asserted a "*Glomar* response," pursuant to 5 U.S.C. § 552(b)(1)

("FOIA Exemption 1"), *id*. § 552(b)(3) ("FOIA Exemption 3"), *id*. § 552a(j)(1) ("Privacy Act

Exemption (j)(1)"), and *id.* § 552a(k)(1) ("Privacy Act Exemption (k)(1)"). Williams Decl. ¶¶ 8, 30; *see* Oct. 2016 CIA Ltr.

On December 23, 2016, Donoghue appealed the CIA's *Glomar* response.  Williams Decl. ¶ 9; *see* Williams Exhibit E (Pl.'s Letter, Dec. 23, 2016) ("Appeal No. NGC22-072A").  On January 6, 2017, the CIA confirmed receipt of the appeal, Williams Decl. ¶ 10; Williams Exhibit F (CIA Response Ltr., Jan. 6, 2017), and on June 27, 2017, the CIA denied the appeal in full, Williams Decl. ¶ 11; Williams Exhibit G (CIA Response Ltr., June 27, 2017) ("June 2017 CIA Ltr."); Compl. at 13–14.

<u>The Instant Matter</u>

On January 17, 2023, Donoghue filed this lawsuit.  *See generally* Compl.   Defendants filed their pending Motion for Summary Judgment on December 18, 2023.  On December 26, 2023, the court entered an Order, ECF No. 26, directing Donoghue to respond to Defendants' Motion for Summary Judgment, and to file any cross-motion for summary judgment, by January 17, 2024, or risk that the court rule on Defendants' Motion without the benefit of his input, *see id*. at 1–3 (citing *Fox v. Strickland*, 837 F.2d 507, 509 (D.C. Cir. 1988) (per curiam)).  On February 5, 2024, Donoghue filed his Opposition,[1] *see generally* Pl.'s Opp'n, , to which Defendant filed a Reply, ECF No. 29.

Three months later, on May 2, 2024, Donoghue filed his Cross-Motion for Summary Judgment, well beyond the deadline.  *See generally* X-MSJ.  Notwithstanding, given Donoghue's

---

[1] In his Opposition, Donoghue discusses a FOIA request that he submitted to the CIA on November 7, 2019, *see* Pl.'s Opp'n at 9–10; Pl.'s Opp'n Exhibit 1 (CIA Resp. Ltr., dated Nov. 27, 2019), ECF No. 27-1, but that request was not identified in the Complaint, *see generally* Compl., and is therefore not before the court, *see Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) ("[P]laintiff may not, through summary judgment briefs, raise the new claims[.]").

incarceration and *pro se* status, the court accepted the late-filed Cross-Motion. *See* Minute Order (entered May 14, 2024). On July 14, 2024, Defendants filed an Opposition, ECF No. 34, to Donoghue's Cross-Motion, and Donoghue late-filed his Reply ("Pl.'s Reply"), ECF No. 35, on August 26, 2024.

## LEGAL STANDARDS

### I.   FOIA

In a FOIA case, a district court reviews the agency's decisions *de novo* and "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B); *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). "[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805, (D.C. Cir. 2006)), *cert. denied*, 139 S.Ct. 1544 (2019); *see also* Fed. R. Civ. P. 56(a).

"[S]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017) (quoting *Jud. Watch, Inc. v. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ("[A]n agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from the Act's inspection

requirements.'") (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  Indeed, an agency's declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Shapiro v. Dep't of Justice,* 40 F.4th 609, 613 (D.C. Cir. 2022) (quoting *Bartko v. Dep't of Justice*, 898 F.3d 51, 74 (D.C. Cir. 2018) (internal quotation marks omitted); *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

Furthermore, "to satisfy FOIA's aims of providing more transparency into the workings of the government," an agency must generally demonstrate that an adequate search for records responsive to a FOIA request was made. *Montgomery v. IRS*, 40 F.4th 702, 714 (D.C. Cir. 2022). This demonstration "entails a 'show[ing] that [the agency] made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'"  *Id*. (quoting *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  The D.C. Circuit has explained that "[w]hile the agency need not search every record system, it also may not limit its search to only one record system if there are others that are likely to turn up the information requested."  *Id*. (internal quotation and citation omitted).  Moreover, "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comp. of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

II.     Privacy Act

In a Privacy Act access case, a court may similarly rely on agency declarations.  *See Chambers v. Dep't of the Interior*, 568 F. 3d 998, 1003 (D.C. Cir. 2009).  At the summary judgment stage, where the agency has the burden to show that it acted in accordance with the statute, a court may rely on a reasonably detailed affidavit, setting forth the search terms and the

10

type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched. *Id.* at 1003. The burden is on the movant to demonstrate why summary judgment is warranted. *Id.* A district court "must determine for itself that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, and then 'should state on the record the reasons for granting or denying the motion.'" *Id.* at 508–09 (quoting Fed. R. Civ. P. 56(a)).

## DISCUSSION

I.   Adequacy of the Searches

Donoghue does not, in earnest, contest the adequacy of either NARA or the CIA's searches, however, the court independently finds their searches sufficient. Defendants bear the initial burden of showing that its searches were adequate. *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). The adequacy of an agency's search is measured by a standard of reasonableness under the attendant circumstances. *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). When an agency's declarations explain in reasonable detail the scope and method of the search, *see Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007) (citations omitted), "[i]n the absence of contrary evidence, such . . . declarations are sufficient to demonstrate an agency's compliance[,]" *North v. Dep't of Justice*, 774 F. Supp. 2d 217, 222 (D.D.C. 2011) (citing *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982) (per curiam)).

NARA submitted a Declaration from Joseph A. Scanlon, a FOIA and Privacy Act Officer with NARA's Office of General Counsel. Scanlon Decl. ¶ 1. The CIA submitted a Declaration from Mary C. Williams, Team Lead and Acting Information Review Officer ("IRO") for the CIA's Litigation Information Review Office ("LIRO"). Williams Decl. ¶ 1. Both declarants have extensive tenure, experience, and personal knowledge regarding (1) the types of documents

11

that their agency maintains, (2) the agency's FOIA and Privacy Act policies and procedures, and (3) Donoghue's FOIA requests. *See id.* ¶¶ 1–4; Scanlon Decl. ¶¶ 1–4.

The court finds that both Scanlon's and Williams' Declarations set forth in reasonable detail, and in good faith, the type of information their agency (and its relevant components) retains, the way that information is organized, the locations searched, the scope of the searches, and the search terms used. *See* Scanlon Decl. ¶¶ 6, 8, 10–11, 13–14, 16, 18–19, 23; Feb. 2017 NARA Ltr.; March 2017 NARA Ltr.; March 2017 LPJC Ltr.; June 2019 NARA Ltr.; Dec. 2019 NARA Ltr.; May 2022 OIG Ltr.; Aug. 2023 NARA Ltr.; Williams Decl. ¶¶ 12–14, 30; Aug. 2016 CIA Ltr.; Oct. 2016 CIA Ltr.; June 2017 CIA Ltr.

Additionally, Donoghue attests that, where relevant, NARA searched the record systems and employed the search terms specified by Donoghue, even though that is not necessarily required. *See* Scanlon Decl. ¶¶ 17–20, 23; Aug. 2023 NARA Ltr. When NARA found responsive records, they were produced in full to Donoghue without redaction, *see id.* ¶ 23, and if no responsive records were found, NARA clearly explained the likely reason for that outcome and provided him with additional resources and advice, *see id.* ¶¶ 8, 10–11, 16; Feb. 2017 NARA Ltr.; March 2017 NARA Ltr.; March 2017 LPJC Ltr.; Dec. 2019 NARA Ltr.; May 2022 OIG Ltr.; Aug. 2023 NARA Ltr.

Similarly, Williams attests that the CIA "conducted thorough and diligent searches of relevant systems of records that were reasonably calculated to find documents responsive to Plaintiff's request as written[,]" Williams Decl. ¶ 13, and that knowledgeable, qualified, and experienced staff searched five separate records systems most likely to contain the requested records, and none were found, *see id.* ¶¶ 12–13, 30.

Consequently, the court finds that both NARA and the CIA have shown "in reasonable detail the scope and method of the search[es] conducted by the agency [sufficient] to demonstrate compliance with the obligations imposed by the FOIA[,]" *Perry*, 684 F.2d at 127, and that its searches were reasonable, *see White v. Dep't of Justice*, 840 F. Supp. 2d 83, 89 (D.D.C. 2012), *aff'd*, No. 12–5067, 2012 WL 3059571 (D.C. Cir. July 19, 2012) (per curiam).

And to the extent that Donoghue sought records that would reveal a classified or unacknowledged association between himself and the CIA, to which the CIA issued a *Glomar* response, *see* Williams Decl. ¶ 14, "the adequacy of a search is irrelevant . . . because the issue is whether the [CIA] has given sufficiently detailed and persuasive reasons for taking the position that it will neither confirm nor deny the existence or non-existence of any responsive records." *Wheeler v. CIA*, 271 F. Supp. 2d 132, 141–42 (D.D.C. 2003) (quoting *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C .Cir. 1976); *Nayed v. INS*, No. 91–805, 1993 WL 524541, at *3 (D.D.C. Nov. 29, 1993) ("Because defendant CIA properly refused to confirm or deny the existence of records . . . the Court need not examine whether the search was adequate.")) (other citation omitted); *see Ppl. for the Eth. Treat. of Animals v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014) (holding that, in issuing a *Glomar* response, an agency "need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents.").

Having "made a *prima facie* showing of adequacy, the burden [then] shifts to [the] plaintiff to provide . . . evidence sufficient to raise 'substantial doubt' concerning the adequacy of the agency's search."  *Schoenman v. FBI*, 764 F. Supp. 2d 40, 46 (D.D.C. 2011) (quoting *Iturralde*, 315 F.3d at 314).  Donoghue has presented no substantive argument, let alone evidence, to challenge the adequacy of NARA or the CIA's searches.

Accordingly, given the evidence submitted by NARA and the CIA, and the good faith afforded their Declarations, and with no countervailing evidence from Donoghue, the court finds that the agencies have met their search obligations under the FOIA.  *See Truitt*, 897 F.2d at 542.

II.     The CIA's *Glomar* Response

In response to a FOIA request, an agency may provide a *Glomar* response, that is, the agency may refuse to confirm or deny the existence of records responsive to the request on the ground that even acknowledging the existence of responsive records would "cause harm cognizable under an FOIA exemption." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982); *see Phillippi*, 546 F.2d at 1014–15 (acknowledging the CIA's refusal to confirm or deny existence of records regarding activities of ship named *Hughes Glomar* Explorer).  "In determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (citation omitted).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* at 374–75 (internal citations omitted).  A court must exercise particular deference to an agency's *Glomar* response "when the information requested 'implicat[es] national security, a uniquely executive purview.'" *EPIC v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 926–27 (D.C. Cir. 2003)).

*FOIA Exemptions 1 and 3*

In issuing its *Glomar* response, the CIA relies exclusively on FOIA Exemptions 1 and 3, and Privacy Act Exemptions (j)(1) and (k)(1)[2].  *See* Williams Decl. ¶¶ 8, 15–25, 30; Oct. 2016

---

[2] Privacy Act Exemption (j)(1) authorizes the Director of the CIA to promulgate regulations that exempt systems of records from the Privacy Act's access and amendment provisions.  Williams Decl. ¶ 26 (citing 5 U.S.C. §§ 552a(j)(1); 32 C.F.R. §§ 1901.62(c), 1901.21(c)).  Privacy Act

CIA Ltr.  Exemption 1 covers "matters 'specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . in fact properly classified pursuant to such Executive order.'"  *Larson v. Dep't of State*, 565 F.3d 857, 861 (D.C. Cir. 2009) (quoting 5 U.S.C. § 552(b)(1)); *see Milner v. Dep't of Navy*, 562 U.S. 562, 580 (2011) (noting that among the "tools at hand to shield national security information and other sensitive materials," the government has "[m]ost notably, Exemption 1 of FOIA [which] prevents access to classified documents.").  Exemption 3 protects "matters 'specifically exempted from disclosure by statute,' provided that such statute leaves no discretion on disclosure or 'establishes particular criteria for withholding or refers to particular types of matters to be withheld.'"  *Id*. (quoting 5 U.S.C. § 552(b)(3)).

An agency withholding information under Exemption 1 must show that the information has been classified in compliance with the classification procedures set forth in the relevant

---

exemption (k)(1) authorizes the Director of the CIA to promulgate rules that exempt agency systems of records from the access provision of the Privacy Act if the system is subject to FOIA Exemption 1.  *Id*. ¶ 28 (citing  32 C.F.R. § 1901. 63)); *see* 5 U.S.C. § 552a(k)(1).  Notably, Privacy Act Exemption (k)(1) models FOIA Exemption 1, and Privacy Act Exemption (j)(1) models FOIA Exemption 3.  *See Wheeler*, 271 F. Supp. at 137; *Braun v. FBI*, No. 18-cv-2145, 2019 WL 3343948, at *6 (D.D.C. July 25, 2019) (explaining same).  Thus, for purposes of the court's analysis, the Privacy Act Exemptions are redundant, *Wheeler*, 271 F. Supp. 2d at 137 n.6 (noting that these same four "provisions track each other, so . . . the fundamental question is whether the requested information is exempt under FOIA," not the Privacy Act), particularly because an agency may not rely exclusively "on any exemption in [the Privacy Act] to withhold from an individual any record which is otherwise accessible to such individuals under the provisions of [FOIA][,]" 5 U.S.C. § 552a(t)(2).  Therefore, the court need only consider the viability of the CIA's FOIA Exemptions.  *See Wheeler*, 271 F. Supp. 2d at 137 n.6; *Subh v. CIA*, 760 F. Supp. 2d 66, 69–70 n.3 (D.D.C. 2011) (finding same as to the treatment of Privacy Act Exemption (j)(1) and FOIA Exemption 3); *Moore v. FBI*, 883 F. Supp. 2d 155, 159 n.2 (D.D.C. 2012) (finding that Privacy Act Exemptions (j)(1) and (k)(1) were "not at issue" because the court need only analyze the use of FOIA Exemptions 1 and 3); *see also Greentree v. Customs Serv.*, 674 F.2d 74, 79 (D.C. Cir. 1982) (finding that "there is no need to determine whether [a] section" of the Privacy Act "meets any of the alternative qualifications" of their coextensive FOIA sections).

executive order and that only information conforming to the executive order's substantive criteria for classification has been withheld. *See Jud. Watch, Inc. v. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (discussing "substantive and procedural criteria for classification"), *cert. denied*, 571 U.S. 1125 (2014); *Lesar v. Dep't of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980) ("To be classified properly, a document must be classified in accordance with the procedural criteria of the governing Executive Order as well as its substantive terms."). Notably, "any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent," *Wolf,* 473 F.3d at 374 (quoting *Halperin v. CIA*, 629 F.2d 144, 149 (D.C. Cir. 1980)). A court shall generally defer to the government regarding what type of information should be classified, *see Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) (per curiam) (explaining that legislative history demonstrates that an agency's declaration should be given substantial deference due to the expertise of the Executive in matters of national security), and moreover, "courts have little expertise in either international diplomacy or counterintelligence operations" and thus "are in no position to dismiss [an agency's] facially reasonable concerns[,]" *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999).

Here, the CIA relies on Executive Order ("E.O.") 13,526, *see* Williams Decl. ¶ 16, which is "the operative classification order under Exemption 1, [that] sets forth both substantive and procedural criteria for classification[,]" *Judicial Watch*, 715 F.3d at 941; *see also* E.O. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009). An agency may "refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under [the Order] or its predecessors." E.O. 13,526 § 3.6(a). E.O. 13,526 contains four requirements: (1) an original classification authority must classify the information; (2) the information must be owned by, produced by or for, or be under the control of the United States

government; (3) the information pertains to one of eight subject-matter classification categories;

and (4) disclosure of the information could reasonably be expected to harm national security.

*See id*. at § 1.1(a); *see also Judicial Watch, Inc*., 715 F.3d at 941.

Williams is an original classification authority because she is the current IRO in the

CIA's LIRO, Williams Decl. ¶ 1, and courts may rely "on affidavits by IROs of sub-groups

within the CIA to classify information in support of *Glomar* response exemptions[,]" *Smith v.

CIA*, 393 F. Supp. 3d 72, 81 (D.D.C. 2019) (citing *Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d

262, 276–77 (D.D.C. 2011)).  The information sought is also "owned by and under the control"

of the United States government because it relates to "intelligence activities, intelligence sources

and methods, and foreign relations or foreign activities of the United States[,]" thus

concomitantly falling into two of the eight classification categories.  *See* Williams Decl. ¶ 18

(citing E.O. 13,526 § 1.4(c), (d)).  Finally, Williams asserts that she "determined that the

existence or nonexistence of records that might reveal a classified or otherwise unacknowledged

association between the subject of the request and the Agency[,]" *id*., and she identifies several

ways in which acknowledging the existence or nonexistence of information could damage

national security, *see id*. ¶¶ 20–22.  More specifically, acknowledgement could "jeopardize the

clandestine nature of the Agency's intelligence activities or otherwise reveal previously

undisclosed information about CIA sources, capabilities, authorities, interests, domestic or

foreign relationships, strengths, vulnerabilities, and/or resources[,]" *id.* ¶ 20, and "would tend to

reveal whether or not the Plaintiff had a covert or clandestine association with the CIA, or

whether or not the CIA had an intelligence interest in the Plaintiff[,]" *id*. ¶ 22.

The court finds this information sufficient to show that that CIA has sufficiently

established that the existence or non-existence of responsive records is classified under E.O.

13,526, thus justifying its *Glomar* response.  *See Carter v. NSA*, 962 F. Supp. 2d 130, 140–41

(D.D.C. 2013) (affirming *Glomar* response under Exemption 1 and E.O. 13,526) (citing

*Bassiouni v. CIA*, 392 F.3d 244, 245 (7th Cir. 2004) (affirming a *Glomar* response to a first-

person request for CIA records on the ground that "providing a list of the documents that

mention [the requester], and claiming document-by-document exemptions for those whose

contents are classified, would reveal details about intelligence-gathering methods," even if

"disclosure could be innocuous"); *People for the Am. Way Found. v. NSA/Cent. Sec. Serv.*, 462

F. Supp. 2d 21, 31 (D.D.C. 2006) (affirming *Glomar* response to a request for records related to

surveillance of the plaintiff because confirmation that a person's activities are not of intelligence

interest, or that the agency was unable to collect intelligence information on his activities would

allow adversaries to accumulate information and draw conclusions about its technical

capabilities, sources, and methods); *Wolf*, 473 F.3d at 376 (concluding that revealing the

existence of CIA records "could potentially reveal targets of CIA surveillance and, thus, CIA

methods" by "signal[ing] to a foreign intelligence service the specific persons and areas in which

the CIA is interested and upon which it focuses its methods and resources")), *aff'd*, No. 13–5322,

2014 WL 2178708 (D.C. Cir. Apr. 23, 2014) (per curiam).

    The CIA's reliance on Exemption 3 is proper for similar reasons.  *See Agility Public

Warehousing Company K.S.C. v. NSA*, 113 F. Supp. 3d 313, 329 (D.D.C. 2015).  To prevail on a

*Glomar* response premised on Exemption 3, the CIA "need only show that the statute claimed is

an exemption statute under Exemption 3 and that the withheld material falls within the statute."

*Smith*, 393 F. Supp. 3d at 83 (citing *CIA v. Sims*, 471 U.S. 159, 167 (1985) (explaining the first

question is whether the statute is an exemption statute, and the second is whether the materials

sought are intelligence sources)).  And again, "it is the responsibility of the [intelligence

community], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process." *Sims*, 471 U.S. at 180.

The CIA satisfies the first requirement by invoking § 102A(i)(1), *see* Williams Decl. ¶ 23, "a recognized withholding statute . . . of the National Security Act of 1947[,]" *see Agility Public*, 113 F. Supp. at 329 (citing *ACLU/DOD*, 628 F.3d at 619). Section 102A(i)(1) shields "intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024.

The CIA has also met the second requirement. Material is properly withheld under § 102(A)(i)(1) of the National Security Act if it "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Halperin*, 629 F.2d at 147 (internal quotation marks omitted). Here, Williams specifically attests that acknowledging the records could place intelligence sources and methods at risk of unauthorized disclosure. *See* Williams Decl. ¶¶ 20–25. Accordingly, the court finds that the CIA has also met its burden in justifying its *Glomar* response under Exemption 3. *See Agility Public*, 113 F. Supp. at 329.

III.    Donoghue's Objections

*Official Acknowledgement Exception*

Donoghue appears to contend that the CIA previously acknowledged the existence of the composite file by allegedly providing it to Baldwin County Circuit Court personnel in 2008. *See* Compl. at 10, 12, 17; Pl.'s Opp'n at 5–8, 11. If an agency has officially acknowledged the existence of a record, it waives its right to rely on a *Glomar* response, "and instead must either: (1) disclose the record to the requester or (2) establish that its contents are exempt from disclosure and that such exemption has not been waived." *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (citations omitted). To constitute an official acknowledgment, the information

requested (1) must be as specific as the information previously released, (2) match the information previously disclosed, and (3) already have been made public through an official and documented disclosure. *Fitzgibbon*, 911 F.2d at 765. A plaintiff "bears the burden of pointing to 'specific information in the public domain that appears to duplicate that being withheld.'" *EPIC*, 678 F.3d at 933 (quoting *Wolf*, 473 F.3d at 378).

Donoghue has offered only speculation regarding the CIA's purported official acknowledgment. *See Schaerr v. Dep't of Justice*, 435 F. Supp. 3d 99, 117 (D.D.C. 2020) (a plaintiff cannot overcome a *Glomar* response based on speculation) (citing *Wolf*, 473 F.3d at 378–79), *aff'd*, 69 F.4th 924 (D.C. Cir. 2023) (per curiam); *Bartko v. Dep't of Justice*, 62 F. Supp. 3d 134, 142–43 (D.D.C. 2014) (speculation "that the individual may have been the subject of an investigation" is not enough to overcome a *Glomar* response under the exception) (citing cases). Indeed, he admits he is uncertain what federal agency, if any, the officials represented, or what agency, if any, authored the file, despite having submitted countless FOIA requests regarding the composite file, to multiple federal agencies, for nearly two decades. *See* Compl. ¶¶ 8–9, 11, 16, 18; *id.* at p. 19; Opp'n at 2–3, 6–8, 11; Pl.'s Reply at 6–7. Simply put, a disclosure is not "official" when it is "made by someone other than the agency from which the information is being sought." *Frugone*, 169 F.3d at 774.

Furthermore, to successfully employ the public acknowledgement exception, a requestor "has the burden of showing that there is a permanent public record of the exact portions he wishes[,]" for example, if the composite file was formally entered into evidence, or "publicly played at trial." *See Jurdi v. United States*, 485 F. Supp. 3d 83, 97 (D.D.C. 2020) (quoting *Davis v. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992); citing *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999)). Here, to the contrary, Donoghue alleges that two unknown agents

20

privately presented a confidential file, marked "DO NOT COPY" to the prosecutor, his attorney, and perhaps a few other court personnel, *see* Pl.'s Opp'n at 6–9, 11; Compl. ¶¶ 8–9, 11.

Accordingly, the court cannot find that the CIA has officially acknowledged the composite file.

### *Bad Faith*

Donoghue also alleges that Defendants have long possessed the composite file and are intentionally withholding it, borne out of a decades-long governmental conspiracy orchestrated to conceal the alleged bad acts in Baldwin County. *See* Compl. 8–10, 12–14, 16, 19–20, 28, 31; Pl.'s Opp'n at 6–7, 16–17; X-MSJ at 3, 6–8; Pl.'s Reply at 2, 6–12, 14–15. In raising this challenge, he cites to E.O. 13,526, subsection 1.7 (1)–(2), which prohibits agency classification of a document to conceal violations of law, inefficiency, or administrative error, or to prevent embarrassment to a person, organization, or agency, *see* Compl. at 15–16; Pl.'s Opp'n at 8.

Donoghue's broad and unfounded allegations are insufficient to overcome the presumption of good faith accorded to Defendants' Declarations. *See Broaddrick v. Exec. Office of President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) ("[I]t is well settled that conclusory allegations unsupported by factual data will not create a triable issue of fact.") (internal quotation marks and citation omitted), *aff'd*, 38 Fed. Appx. 20 (D.C. Cir. 2002) (per curiam); *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986) (finding the plaintiff's "claims of bad faith," rooted in his belief that the agency intentionally withheld documents "whose existence remains purely a matter of unsupported speculation"); *see also Nance v. FBI*, 845 F. Supp. 2d 197, 201 (D.D.C. 2012) (holding that "whether a search is adequate is determined by methods, not results . . . [and an] agency's failure to locate . . . specific responsive document[s] will not, on its own, render an

otherwise reasonable search inadequate.") (citation omitted), *appeal dismissed*, No. 12–5073, 2012 WL 1922387 (D.C. Cir. May 7, 2012).

Similarly, Donoghue splits hairs over the CIA's language to support his contention that the CIA's *Glomar* response constitutes an implicit admission that it possesses responsive documents, thus "infer[ring] that the CIA had some form of association regarding Donoghue in the past." Pl.'s Reply at 4; *see* Pl.'s Opp'n at 11–12; Compl. at 14–16. This argument is unavailing. As the CIA clearly instructed, a *Glomar* response is "a standard notification given to all . . . requesters and should not be taken as an indication excluded records do, or do not, exist." *See* May 2022 OIG Ltr. Despite Donoghue's insistence otherwise, "[a]gencies must issue [*Glomar*] responses in all cases where requests implicate classified information—*whether or not* responsive records exist." *See Braun*, 2019 WL 3343948, at *4; *see also* Williams Decl. ¶ 22. "Otherwise, a *Glomar* response would do no good at all." *Braun*, 2019 WL 3343948, at *4.

Consequently, the court finds no merit in Donoghue's arguments that Defendants' Declarations indicate bad faith.

### *Privacy Act Exemption (k)(2) & Donoghue's Constitutional Rights*

Donoghue argues that, in allegedly sharing the composite file with attorneys and court officials, the CIA allegedly violated his Sixth, Ninth, Thirteenth, and Fourteenth Amendments, thus mandating its disclosure to him under § 552a(k)(2) ("Exemption (k)(2)") of the Privacy Act. *See* Pl.'s Opp'n at 11–13; X-MSJ at 3–8. Exemption (k)(2) of the Privacy Act exempts from disclosure "investigatory material compiled for law enforcement purposes," but provide an exception that "if any individual is denied any right, privilege, or benefit that he would otherwise be entitled by Federal law, or for which he would otherwise be eligible, as a result of the maintenance of such material, such material shall be provided to such individual[.]" *See* 5

U.S.C. 552a(k)(2).  But there are no records "compiled for law enforcement purposes" at issue in this case because the CIA has not relied on Privacy Act Exemption (k)(2); it relies on Privacy Act Exemptions (k)(1) and (j)(1).  *See* Williams Decl. ¶¶ 26–29.  Therefore, Exemption (k)(2) is irrelevant.  *See Nat'l Archives and Records v. Favish*, 541 U.S. 157, 166 (2004) (finding that the requester fundamentally "misapprehend[ed]" the government's use of exemptions, and that the requester could not rely on a different subset of that exemption because "a different set of considerations would control.").

Insofar as Donoghue challenges the constitutionality of his conviction based on the use of this composite file, *see* Pl.'s Opp'n at 1–2, 11–13; X-MSJ at 5–7; Pl.'s Reply at 2, 6–12, 14–15, he cannot use this case to do so, *see Johnson v. EOUSA*, 310 F. 3d 771, 777 (D.C. Cir. 2002) (holding that FOIA and Privacy Act do not offer a remedy for alleged violations of constitutional rights even if the requested records might support a challenge to criminal conviction); *see Donoghue*, 157 F. Supp. 3d 21, 23 n.2 (D.D.C. 2016) (finding that Donoghue could not expand the scope of his FOIA/Privacy Act action to address constitutional criminal procedure claims).

### *In Camera Review, "Balancing Tests" and Vaughn Index*

Donoghue next asks the court not to "acquiesce[] to the government's desire not to disclose," and demands that the CIA present evidence *in camera* to show that it appropriately relied on its cited Exemptions, and only then can "the Court must perform its balancing test." Pl.'s Opp'n at 14–15.  He further alleges that 5 U.S.C. § 552(b)(6) ("Exemption 6") and (b)(7) ("Exemption 7") protect his personal information, and that the CIA violated those provisions by releasing the composite file to Baldwin County Court personnel.  *See id.* X-MSJ at 2–3; Reply at 13.  He also demands that Defendants produce a *Vaughn* Index.  *See* Compl. at 1; X-MSJ at 8.

First, *in camera* review is only appropriate where "the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency." *Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996); *see also* 5 U.S.C. § 552(a)(4)(B). Neither circumstance is present here. Although district courts possess broad discretion in conducting *in camera* review, *Carter v. Dep't of Commerce*, 830 F.2d 388, 392 (D.C Cir. 1987), such review is considered "a last resort in 'national security' situations[,]" *Weissman v. CIA*, 565 F.2d 692, 697 (D.C. Cir. 1977), and "a court should not resort to it routinely on the theory that 'it can't hurt,'" *Ray*, 587 F.2d at 1195. Here, the court has concluded that, based on its detailed Declaration, the CIA has met its burden to "place the challenged documents within the exemption categories," *Larson*, 565 F.3d at 870, and Donoghue has not shown any indicia of bad faith; therefore, "*in camera* review is neither necessary nor appropriate," *Hayden v. National Sec. Agency/Central Sec. Service*, 608 F.2d 1381, 1387 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 937 (1980).

Second, there is no need for the court to conduct a balancing test; the CIA does not rely on either FOIA Exemption 6 or 7, it relies strictly on FOIA Exemptions 1 and 3, neither of which include a balancing test. *See Ctr. for Int'l Env't Law v. Off. of U.S. Trade Rep.*, 718 F.3d 899, 904 (D.C. Cir. 2013); *Smith*, 393 F. Supp. 3d at 83.

Third, *assuming arguendo* the CIA even produced the composite file in 2008, neither Exemption 6 nor Exemption 7, nor any other FOIA exemption, create a private right of action for Donoghue to allege a violation of his fundamental right to privacy. *See Cause of Action Institute v. IRS*, 390 F. Supp. 3d 84, 91–92 (D.D.C. 2019) (noting that the FOIA's judicial review provision, 5 U.S.C. § 552(a)(4)(B), erects strict "boundaries of a district court's remedial powers

under the FOIA[.]") (quoting *Camp. for Accountability v. Dep't of Justice*, 278 F. Supp. 3d 303, 312 (D.D.C. 2017)).

Under the FOIA, a district court has limited "jurisdiction to enjoin the agency from *withholding* agency records and to order the *production* of any agency records improperly withheld from the complainant[.]" *See id*. at 91 (quoting 5 U.S.C. § 552(a)(4)(B)) (emphasis added).  It does not provide the court with any additional authority, including the power to order an agency to "create documents, [or] to answer questions," and Donoghue's "pursuit of advisory legal opinions . . . with respect to federal questions" has no place in the FOIA.  *See Brown v. FBI*, 675 F. Supp. 2d 122, 129–30 (D.D.C. 2009); *Greenpeace, Inc. v. Dep't of Homeland Security*, 311 F. Supp. 3d 110, 124 (D.D.C. 2018) (finding that a court should decline independent provision of additional remedies to the FOIA, and noting that "FOIA plaintiffs must take the bitter with the sweet[,]" focusing on "the merits of their" request for production of records, rather than "the niceties of agency procedure[.]") (quoting *Sandoz Inc. v. Amgen Inc*., 582 U.S. 1, 16 (2017); citing *Nw. Airlines, Inc. v. Transp. Workers Union of Am*., 451 U.S. 77, 94 (1981) ("It is, of course, not within our competence as federal judges to amend these comprehensive enforcement schemes by adding to them another private remedy not authorized by Congress.")) (other citations omitted); *see also Cunningham v. Dep't of Justice*, 961 F. Supp. 2d 226, 242–24 (D.D.C. 2013) (finding that there is no private right of action for an alleged "constitutional deprivation" under the FOIA); *Chrysler Corp. v. Brown*, 441 U.S. 281, 282 (1979) ("The FOIA is exclusively a disclosure statute and affords petitioner no private right of action to enjoin agency disclosure.").

Finally, the court finds no basis for a *Vaughn* Index in this case.  A *Vaughn* index itemizes and explains redactions in a FOIA production, *see Vaughn v. Rosen*, 484 F.2d 820, 827

(D.C. Cir. 1973), but in this case, there are no redactions, as NARA produced its responsive records in full.  *See* Scanlon Decl. ¶ 23.  The CIA produced no records, as they did not locate any unclassified records, and issued a *Glomar* response for classified records, if any.  *See* Williams Decl. ¶¶ 13–25.  Therefore, directing either Defendant to produce a *Vaughn* index would be an exercise in futility.  *See Wolf*, 473 F.3d at 374 n.4 (noting that a *Vaughn* Index is needless where an agency has issue a *Glomar* response)  (quoting *Phillippi*, 546 F.2d at 1013) ("When the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal.")); *see also Jarvik v. CIA*, 741 F. Supp. 2d 106, 112 n.6 (D.D.C. 2010) (finding that "a *Vaughn* index is not necessary if it 'could cause the very harm that [the exemption] was intended to prevent,' or 'where there are no responsive records to describe in a Vaughn index[.]'") (quoting *Linder v. Nat'l Security Agency*, 94 F.3d 693, 697 (D.C. Cir. 1996); *Casillas v. Dep't of Justice*, 672 F. Supp. 2d 45, 48 (D.D.C. 2009)); *Heartland All. For Hum. Needs & Hum. Right v. Immig. & Cust. Enf.*, 406 F. Supp. 3d 90, 125 (D.D.C. 2019) ("An agency does not necessarily need to produce a *Vaughn* Index in every FOIA suit.").

Accordingly, the court is not persuaded by any of these arguments.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED, and Plaintiff's Cross-Motion for Summary Judgment is DENIED.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Date:  September 23, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

26